IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA

v.                                                    CASE NO. 1:99cr 15-MMP/AK

JAMES BOSWELL,

            Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 859, Defendant James Boswell's motion to

vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.  The Government has filed its

response, Doc. 900, and Defendant has filed a reply.  Doc. 911.  This cause is therefore now in a

posture for decision.  Having carefully considered the matter, the Court recommends that the

motion to vacate be denied.

## BACKGROUND

The defendant, James Boswell, was charged in a three-count superseding indictment with

conspiracy to possess with intent to distribute and to distribute cocaine and with using and

carrying a firearm during and in relation to a drug trafficking crime.  Doc. 92.  The superseding

indictment also contained a criminal forfeiture count.  *Id.*  Also indicted were five other co-

defendants.  *Id.*  The superseding indictment did not allege any drug quantity.  *Id.*  Defendant

retained the services of four attorneys to represent him in this matter: John L. (Jack) Smith, who

served as lead trial counsel; John H. Harralson, III, and Trevor Smith, who also served as trial counsel; and Edward A. Wilson.  Docs. 80-83; 900, App. B.  Although Mr. Wilson had represented Defendant and his family in the past, Jack Smith was "the most experienced member of this defense team," Doc. 900, App. E, having "served on two (2) prior occasions as the United States Attorney for the Western District of Kentucky and formerly was the Justice Secretary for the Commonwealth of Kentucky."  *Id*. at App. B.  Consequently, "Mr. Smith formulated the overall defense strategy after consultation with the other attorneys, Mr. Boswell and his family members."  *Id*. at App. E.

On May 12, 1999, the co-defendant, Christopher Reed, pled guilty.  Docs. 143 & 144.  Terry Glasscock then made numerous pretrial motions, including a motion to dismiss for pretrial delay, Doc. 146; a motion to sever from co-defendants, Doc. 147; a motion for disclosure of informant identity, Doc. 148; a motion for *James* hearing, Doc. 150; a motion for bill of particulars, Doc. 152; a motion for change of venue, Doc. 153; and a motion to suppress evidence seized at his home.  Boswell joined in these motions.  Doc. 191.  He also filed his own set of motions: (1) motion to suppress evidence seized in the Kentucky searches, Doc. 184; (2) motion for *James* hearing, Doc. 185; (3) motion to dismiss indictment due to pre-indictment delay, Doc. 186; (4) motion for bill of particulars, Doc. 187; (5) motion for change of venue, Doc. 188; (6) motion to suppress testimony of certain informants, including Larry Sangaree, Doc. 189; and (7) motion in limine to exclude use of audio and video recordings of controlled buys, Doc. 190.

On May 27, 1999, the co-defendant, Walter Penick, pled guilty to Count I and after a bench trial, was found guilty on Count II.  Docs. 180, 182, 202, & 241.

On that same date, the Court held a hearing on all pending motions, including those made by Terry Glasscock and James Boswell.  At that time, the Court denied the motions to dismiss, for disclosure of informants, and for a *James* hearing.  Doc. 200.  As to Glasscock's motion to sever, the Court found that Terry Glasscock should be severed from co-defendants Aaron Glasscock and Frank Merold, but that he could be tried with the other co-defendant, James Boswell.  *Id*.  The Court denied the motions for a bill of particulars to more fully reveal "the precise quantity of controlled substances that [were] involved in the total conspiracy, as well as the amount attributable to each defendant," finding that the indictment sufficiently informed Glasscock and Boswell of the charges against them and allowed them to assert double jeopardy later.  *Id*.  The Court also denied Boswell's motion to suppress testimony of certain informants, finding that the "informants were merely fellow inmates who learned the information on their own without government direction."  *Id*.  Finally, the Court denied the motions to transfer venue to Kentucky, where Terry Glasscock and James Boswell lived, on the ground that several of the overt acts occurred in the Northern District of Florida and most of the witnesses were from Florida.  *Id*.

Approximately two weeks before trial, Boswell filed a motion for sanctions for prosecutorial misconduct, Doc. 203 and a motion to allow attorney-conducted jury voir dire. Doc. 204.  Shortly thereafter, Terry Glasscock filed a motion to suppress pursuant to *Franks v. Delaware*.  Doc. 212.  On the first day of trial, the Court heard oral argument on the remaining motions, which, in pertinent part,  were either denied or found to be moot.  Doc. 232.

The case then proceeded to trial against Boswell and Terry Glasscock only.  The jury convicted both defendants on all counts and returned a special verdict that Boswell had earned

$16,000,000.00  "from his illegal drug activity during and in furtherance of the conspiracy set forth in the indictment."  Docs. 235 & 237.  Counsel for Boswell subsequently renewed their motion for judgment of acquittal or for new trial on various grounds, including attacks on evidentiary rulings and the failure of the Government to provide *Jenck's* material, to maintain agents' notes, and to prove a single, extended conspiracy as charged in the indictment. Doc. 251.  The motion was signed by Messrs. Jack Smith, Trevor Smith, and John Harralson.  Mr. Wilson did not sign the motion, and the Court finds no further mention of him in the record.  The Court denied the motion without elaboration.  Doc. 258.

On August 11, 1999, a jury found co-defendant Merold guilty on Count I and not guilty on Count II.  Doc. 298.  On September 7, 1999, the Government filed a motion for upward departure in the event that the Court refused to enhance Boswell's sentence for obstruction of justice, arguing that he should nevertheless receive a two-level enhancement for the firearms. Doc. 329.  On September 13, 1999, Boswell filed a motion to disregard sentencing guidelines on the ground that the life sentence anticipated under the Sentencing Guidelines was "grossly disproportionate to the nature of the underlying offense."  Doc. 332.  On the day before sentencing, Boswell's counsel moved *ex parte* for a polygraph examination of their client.  Doc. 335.

On September 17, 1999, the parties appeared for sentencing.  Boswell's counsel specifically objected to ¶ 42 of the Presentence Report, which addressed the obstruction enhancement, and as previously noted, counsel requested a polygraph examination of Mr. Boswell for the specific purpose of refuting Sangaree's testimony that Boswell "put his fingers in the shape of a gun and pointed them at Larry Sangaree."  Doc. 429 at 2.

The Court initially allowed Boswell's counsel to argue the polygraph motion, which the Court denied without explanation.  The Court also denied Defendant's request for any further continuance of sentencing so that counsel could investigate "certain persons that we believe have overheard admissions of Walter Penick," such as bragging to fellow inmates "that the $900,000 recovered on March 11, 1999, in fact belonged to he, Penick."  *Id*. at 4-9.

As previously noted, in pertinent part, counsel objected to ¶ 42 of the PSR.  Before imposition of sentence, counsel argued:

> We object to this paragraph in its entirety.  As noted in pleadings before, during and after trial and arguments, we believe Larry Sangaree is essentially a government agent whose entire mission in life at this point is to elicit incriminating statements from people incarcerated.
>
> We believe that if he doesn't get those statements, he may make them up.  And, in any event, we think his approaching of the defendant under those circumstances violated the defendant's...right to due process and his...right to counsel.  We believe it would be impossible for such a finger point to occur, as...Mr. Sangaree testified at trial, just due to the layout of the prison over there, the yard, the pods as they come into the yard would make it impossible for him to see what he said he saw.
>
> And as...we discussed earlier, the defendant is willing to take a polygraph with respect to this specific allegation.
>
> I think you cannot rely solely on Mr. Sangaree's testimony for this.  He is just not that credible.  And it's especially true where the two point offense level can be the difference between 30 years to life and a straight life sentence....

*Id*. at 13-14.

Counsel then argued the motion to disregard sentencing guidelines:

> We believe the life sentence or anything approaching a life sentence would be cruel and unusual punishment under the Constitution, especially in this case where there can be no accurate count as to the amount of cocaine.  It appears that someone else may have stepped forward after the trial and admitted, specifically Walter Penick, that he was...the principal conspirator in this case.

*Id*. at 17-18.

The Government then explained its position regarding an enhancement for the gun

conviction:

> [Boswell] objected to all of the paragraphs adding up the levels. But those objections should be overruled. He is at level 38 for the cocaine, plus four for being an organizer or leader, plus two for threatening the witness, which puts him at level 44.
>
> They say that: Well, if you take away the two points for obstruction, then he is going to be at 30 to life instead of life. That is not correct. Even if he was at level 42, you should still depart up two levels for the gun.
>
> * * *
>
> Otherwise you would have the ridiculous situation of a defendant being better off for getting convicted.
>
> * * *
>
> Where a defendant would receive a bargain, the Court should impose a two level increase.
>
> So the bottom line of this...is, if you sustain...the objection to the obstruction, and he is at level 42, you should score the gun and bring him back up to level 44....So their position that this whole thing about Larry Sangaree is critical really isn't. Because, even if Your Honor does that, he should still get two levels.

*Id*. at 25-30.

After hearing counsel's arguments, the Court overruled the objection to ¶ 42, stating:

"The testimony at trial was that these events did take place. And...a reasonable inference would

be that they were intended to be that they were a threat to a testifying government witness." *Id*. at

37. The Court also overruled the Government's motion for upward departure. *Id*. at 40. It then

sentenced Boswell to life imprisonment on Count I and 60 months on Count II, to run

consecutively. Court sentenced Boswell to life imprisonment on Count I, with a consecutive term

of 60 months on Count II.  Docs. 336 & 346.

Boswell then appealed.  Doc. 349.  Shortly thereafter, Messrs. Jack Smith, Trevor Smith, and John Harralson moved to withdraw as counsel of record.  Doc. 393.  The motion was granted over the Government's objections.  Docs. 394 & 434.

After three mistrials, Docs. 283, 327, & 376, the co-defendant, Aaron Glasscock, was found guilty on Count I and not guilty on Count II.  Doc. 483.

While his appeal was pending, Boswell moved for remand to consider the applicability of *Apprendi*.  Doc. 729.  The Court denied the motion without elaboration.  Doc. 731.

On January 17, 2002, the Eleventh Circuit affirmed without opinion.  Doc. 813.  The instant § 2255 motion ensued.

On this occasion, Boswell, represented by counsel, alleges two grounds for relief.  Doc. 859.  In the first ground, Boswell charges that there was an actual conflict of interest between him and Mr. Wilson, who "placed his own legal well-being before that of his client," based on his "need to shield from exposure his own involvement in certain illegal activity...."  *Id*.  This conflict, in Boswell's view, precluded counsel from being "an unbiased member of the defense team" and "affected advice given to Mr. Boswell regarding cooperation."  *Id*.  According to Boswell, Mr. Wilson "abandoned" him during trial "after learning of questions which had arisen."  *Id*. More specifically, Boswell alleges:

> Mr. Wilson was involved in protecting drug operations in Kentucky and by virtue of his involvement violated the law.  He accepted cash payments for information/protection from, upon information and belief, multiple drug dealers. He accepted regular payments from Greg Boswell.  He signed on to the Boswell defense team, accepting $40,000+ advance fee, knowing of the conflict between himself and Mr. Boswell and knowing that his only role in the case was to listen and learn what the intentions of Mr. Boswell were so that he could better protect himself.

*Id.*

In the second ground, Boswell charges that counsel engaged in "no meaningful legal research or motion preparation; no investigation; no meaningful mustering of witnesses for the defense; no attempt to impeach Government witnesses and a complete failure to contest the factual impossibility of certain witnesses' statements." *Id.* More specifically, he alleges that counsel (1) failed to conduct "meaningful legal research," (2) "[r]elied too much and for too long on the pending request to return the venue of this prosecution to Kentucky, thereby postponing any meaningful preparation until the eve of trial," (3) "[f]ailed to present...medical and lay testimony about the inability of chief Government Witness Walter Penick to comprehend and to recall events," (4) failed to investigate "any phase of the Government's case [or] secure impeaching evidence...on testifying Government witnesses, and generally ignored the requests for preparation made by their client," (5) failed to consult with Boswell or his family, and (6) failed timely to move for a polygraph examination and photographic evidence to refute testimony of Larry Sangaree. *Id.*

## **DISCUSSION**

I.      Conflict of interest.

When a defendant charges that his attorney operated under a conflict of interest, the defendant must first show the existence of an actual conflict of interest. *Pegg v. United States*, 253 F.3d 1274, 1277 (11th Cir. 2001). To prove a Sixth Amendment violation, the defendant must then prove that the conflict adversely affected counsel's performance. *Id.* To prove adverse effect, the defendant must show: "(1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was

reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." *Id*. at 1278.

In this case, Boswell's only allegations regarding Mr. Wilson are those previously quoted, and they go only to the issue of whether Mr. Wilson operated under an actual conflict of interest. Assuming arguendo that Boswell's allegations regarding Mr. Wilson are true and correct,[1] it cannot find that Boswell has met his burden of showing that the conflict adversely affected his Sixth Amendment right to effective assistance of counsel. At no point does Boswell refute the averments of Messrs. Jack Smith, Trevor Smith, and John Harralson–none of whom are charged with any conflict whatsoever–that they "collectively concluded that it was in the best interest of Mr. Boswell to enter a plea of guilty and try to avoid the type of sentence that he ultimately received," that they advised him of this point "orally and in writing," and that "Mr. Boswell rejected counsel's advice and recommendation and elected to proceed to trial by jury." Doc. 900, App. B-D. While Defendant faults the Government's proof as a mere "mantra that they all wanted Mr. Boswell to plead guilty," he offers nothing to suggest that the Court should not credit counsel's affidavits, except a vague statement that the Government failed to present any proof about "discussions with either Mr. Boswell or the Government about such plea or whether the information about Mr. Wilson was factored in to the decision."

The law is clear that it is not the Government's burden to show that Mr. Wilson's presumed conflict adversely affected Defendant's constitutional rights. Like the defendant in *Pegg*, Boswell "had the advice of several attorneys," *Pegg*, 253 F.3d at 1278, and he does not

---

[1]The Court is not making a definitive finding on this point, as Defendant's allegations of criminal wrongdoing on Wilson's part are quite serious. Rather, it makes the assumption of an actual conflict only in the interest of judicial economy.

offer even a generalized denial of these attorneys' assertions that "the [defense] plan...was devised by [Jack Smith], an attorney who did not act under any conflict of interest." *Id*. While the *Pegg* decision was reached after an extensive evidentiary hearing, such a hearing is not warranted in this case, and Defendant's argument that "[a]ny deficit of facts" can now be cured by discovery is unpersuasive. Boswell, who is represented by counsel, did not submit an affidavit from himself or any other person which puts into question any of the averments made by the conflict-free attorneys, an action which he could have taken without permission from the Court or formal resort to the discovery process. Furthermore, he does not explain why, if he knew that Mr. Wilson was accepting "regular payments" from him and other drug dealers for "provision of security for drug organizations," he hired Wilson as part of his defense team if he suspected him of putting his own interests before his clients, and why Boswell never told the other three attorneys, who had no conflict with him, of his suspicions. He also does not explain how Wilson's absence from trial, for whatever reason–whether to protect himself from investigation and prosecution, as Defendant alleges, or to conduct investigation and research or to limit the number of person's at counsel table, as the other attorneys maintain--adversely affected his defense. With no counter-evidence or explanations from Boswell, an evidentiary hearing is not mandated by the rules.

　　II.　　Ineffective assistance of counsel.

　　Because Defendant's final claims involve allegations that his counsel wer ineffective, a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate before the Court examines each claim individually.

　　To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must

demonstrate (1) that his counsel's performance was below an objective and reasonable

professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at

686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either

the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of

counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see

also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual

support for his contentions that counsel's performance was constitutionally deficient.  *Smith v.

White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must consider counsel's performance

in light of all of the circumstances at that time and indulge in a strong presumption that counsel's

conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at

689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no

competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*,

257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not

sufficient to disprove the strong and continuing presumption...that [counsel] did what he should

have done and that he exercised reasonable professional judgment."  *Chandler v. United States*,

218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).  "The

relevant question is not whether counsel's choices were strategic, but whether they were

reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute rules" for

determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would

interfere with counsel's independence–which is also constitutionally protected–and would

restrict the wide latitude counsel have in making tactical decisions."  *Putnam v. Head*, 268 F.3d

1223, 1244 (11ᵗʰ Cir. 2001).  "To uphold a lawyer's strategy, [the Court] need not attempt to

divine the layer's mental processes underlying the strategy."  *Chandler*, 218 F.3d at 1315 n.16.

"No lawyer can be expected to have considered all of the ways [to provide effective assistance]."

*Id*.  Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable
> courses of defense (that the lawyer did not think of at all) existed and that the
> lawyer's pursuit of course A was not a deliberate choice between course A,
> course B, and so on.  The lawyer's strategy was course A.  And [the Court's]
> inquiry is limited to whether this strategy, that is, course A, might have been a
> reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable

conduct might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*,

466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A

"reasonable probability is defined as a probability sufficient to undermine confidence in the

outcome."  *Id*.  Additionally, prejudice is established only with a showing that the result of the

proceeding was fundamentally unfair or unreliable.  *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions

set forth above, "the cases in which habeas petitioners can properly prevail...are few and far

between."  *Chandler*, 218 F.3d at 1313 (11ᵗʰ Cir. 2000).  This is because the test is not what the

best lawyers would have done or even what most good lawyers would have done, but rather

whether a reasonable lawyer could have acted in the circumstances as defense counsel acted.

*Williamson v. Moore*, 221 F.3d 1177, 1180 (11ᵗʰ Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

    A.       Failure to conduct legal research.

Defendant first attacks counsel's failure to "recognize the concept that any element of the crime must be pled in the Indictment and proven beyond a reasonable doubt to a unanimous jury." Doc. 859. In other words, counsel should have attacked the indictment on *Apprendi* grounds for its failure to charge drug quantity. This claim is without merit. Counsel did, in fact, seek that information via a bill of particulars to more fully reveal "the precise quantity of controlled substances that [were] involved in the total conspiracy, as well as the amount attributable to each defendant," which the Court denied on the ground that the indictment sufficiently informed Boswell of the charges against him. Since *Apprendi* had not been decided at that time, the failure of his attorneys to anticipate *Apprendi* is not ineffective assistance of counsel. *United States v. Ardley*, 272 F.3d 991, 993-94 (11th Cir. 2001).

Boswell next attacks counsel's failure "to adequately address legal issues" regarding his conviction on the firearms charge, as, according to him, it is clear from the evidence that he "possessed no gun and there was absolutely not one scintilla of evidence that he believed that or instructed that the carrying of any firearm was a necessary element toward effectuation of the alleged drug purchase." Doc. 859. Even if the Court assumes that counsel should have raised this issue before trial, it is beyond dispute that Boswell was not prejudiced by the failure. The issue was raised on direct appeal, *see* Doc. 900, App. A, 21-50, and rejected by the Eleventh Circuit. As the Government explained in its appellate brief, Boswell was liable for the reasonably foreseeable actions of his co-conspirators, including carrying a firearm in relation to the drug trafficking conspiracy, even if he did not personal carry the gun or direct that it be carried. *See United States v. Bell*, 137 F.3d 1274 (11th Cir. 1998); *Pinkerton v. United States*, 328 U.S. 640 (1946). This was also the instant Court's bench findings regarding co-defendant

Penick's culpability on the gun charge. *See* Doc. 241. Based on the Court's findings and reasoning after Penick's trial, there is no reasonable probability that if Boswell's trial counsel had challenged the gun count, the outcome of the proceeding would have been any different. Therefore, counsel was not ineffective for failing to raise legal challenges to the gun count.

      B.     Failure to prepare until eve of trial.

     In this ground for relief, Boswell maintains that "in spite of his family's request," trial counsel delayed any investigation in this case because, in his opinion, "of the pendency of the request for change of venue to Kentucky...." Doc. 859 (emphasis omitted). In Boswell's view, counsel failed promptly to act because of their "ongoing belief...that this Court would not require the trial of this case in the prompt manner in which it had been scheduled."

     The fact that counsel sought a change of venue and made the best argument that they could in support of that request does not mean that they so truly believed in its success that they would otherwise fail to prepare for an impending trial. Even a cursory review of the docket shows that the motion practice in this case was not, as Defendant characterizes it, "paltry," and in criticizing counsel's trial preparation, Defendant fails to specify what other motions counsel should have filed. The law does not require that counsel file frivolous motions merely because the client thinks they should. Furthermore, the fact that counsel did not seek additional funds from Defendant or his family for investigation does not, in and of itself, indicate a lack of investigation or preparation. Finally, it is inconceivable that lead trial counsel, who had been a United States Attorney on two separate occasions, would have tied his trial preparation strategies to any "expectation of continuances." Boswell made his only request for a continuance before the filing of the superseding indictment. At arraignment on the superseding indictment, the

Court re-set the trial date to June 14, 1999.  This gave counsel five and one-half weeks to prepare

for trial and resulted in a three-week extension of the May 24, 1999, trial setting, which

Defendant had sought to continue.  Doc. 86.  As a former United States Attorney, Mr. Jack

Smith would have been intimately familiar with the Speedy Trial Act and the very clear set of

circumstances which must be shown to permit the Court to continue a criminal matter.  *See* 18

U.S.C. § 3161(h).  In this regard, Defendant seems to be doing little more than second guessing

the strategic choices his attorneys made while providing no specifics as to what could have been

achieved by a further delay in the trial of this case.

In short, Defendant's claim that his attorneys placed all their eggs in the venue basket is

vague and totally unsupported by the evidence before this Court.

C.       Failure to present testimony impeaching Walter Penick's credibility.

In this claim for relief, Defendant argues that counsel was ineffective for failing to

present "medical expert testimony" to "properly evaluate what effects [Penick's] illnesses, his

drinking, and his lifestyle had on his ability to comprehend and to adequately recollect."  In

Defendant's estimation, "a medical doctor who had access to the records of Mr. Penick could

have opined on his abilities to comprehend and recollect."  Doc. 859.  According to Defendant,

he asked his attorneys to secure the attendance of Mr. Penick's treating physician and advised

them of "several other witnesses who were available to testify about Mr. Penick and his general

veracity."  *Id*.  In particular, Defendant wanted Penick to be questioned about "his ready cash

over the years."  More specifically, Defendant alleges that he "was told" that Sandy Garrett, a

waitress, "would have testified that, in spite of his 'indigent' status before this Court...[Penick]

spent virtually every night in...a bar/lounge in Kentucky" and "routinely tipped great amounts of

money, many times reaching $700 per week." *Id*.

Furthermore, Defendant charges that his counsel "failed to secure the prior convictions and underlying accusations made against Mr. Penick," which prejudiced him "because these witnesses and facts would have portrayed Mr. Penick as a sly opportunist who immediately incriminated himself which necessitated him to paint a picture of a viable witness." *Id*. In addition, Boswell maintains that he gave counsel the "names of certain individuals who were incarcerated with Mr. Penick from time to time," including, "upon information and belief," Rocky Norman, who "had stated that he had talked with Mr. Penick who *admitted* to Mr. Norman that Mr. Penick was the owner and mastermind of the drug smuggling ring." *Id*. (emphasis in original).

To reiterate, to show counsel's performance was unreasonable, Boswell must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11ᵗʰ Cir. 2001) (emphasis omitted). In this case, that would include failing to call Penick's treating physician, a waitress, an inmate, and other unspecified witnesses. Having reviewed Mr. Penick's entire testimony, the Court cannot find any deficiency in counsel's cross-examination of him, and even if Defendant's trial team should have called these witnesses, there is no reasonable probability that the outcome of the proceeding would have been different.

On direct examination, Penick was very clear regarding his role in the conspiracy, i.e., at Boswell's direction, he transported large sums of money and cocaine between Kentucky and Florida from 1994 to 1999. Penick was candid regarding his health problems, and on cross-examination, counsel elicited from him that there were times when he was taking large quantities

of drugs which affected his behavior and "caused [him] to be unstable a bit.  And it caused [him] to have little bouts of depression every now and then" which went untreated.  Doc. 426 at 147-48.  Additionally, he acknowledged that Boswell paid him in cash and gave him money whenever he asked for it.  Counsel questioned Penick extensively about his criminal history and his plea and cooperation agreement and probed his motives for testifying against Boswell, which certainly placed his credibility in issue.  *Id*. at 148-54.  He followed up with a very strong closing argument attacking Penick's memory and his motivations.  Though there may have been other witnesses who could have testified on these very issues, as Boswell suggests, counsel's decision not to call them but instead to impeach the witness directly with his own words was a reasonable strategic choice.

Even if the Court assumes some deficiency in this regard, Boswell cannot establish prejudice.  Though it must agree that Penick was an important witness, he was not the only witness or the only evidence of Boswell's involvement in this drug conspiracy, which included, for example, a tally sheet in Boswell's handwriting found in Terry Glasscock's safe, taped controlled drug buys involving Boswell and cooperating witnesses besides Penick, and unexplained assets which vastly exceeded Boswell's reported income.  While additional witnesses might have further eroded Penick's credibility than counsel was able to establish through his cross-examination of Penick himself, Defendant cannot show that the failure to call further witnesses resulted in a fundamentally unfair or unreliable verdict in this case.  *See Lockhart*, 506 U.S. at 370.

> D.     Failure to investigate and secure impeaching evidence on Government witnesses and ignoring requests for preparation.

In this claim, Boswell focuses on the Government's witness, Larry Sangaree, who

testified that, while they were incarcerated together, Boswell told him he "was the money man and was the kingpin of the [big Kentucky case going on down in Gainesville]."  Doc. 427 at 45. Sangaree also testified that Boswell made a threatening gesture at him in the form of a "pistol shot" after he started cooperating in this case.  *Id*. at 48-9.

Defendant's characterization of Sangaree as a "featured witness" for the Government is hardly compelling.  Doc. 859.  Mr. Sangaree's testimony comprised only twenty-three pages of the entire trial transcript, and Defendant's counsel was able repeatedly to point out to the jury Sangaree's penchant for deception and manipulation and his very strong motivation in coming forward with his information about Boswell.  While Defendant benefitted from the Government's filing of a 5K1.1 motion for substantial assistance, he was certainly not credited by the Government with securing Defendant's conviction.  *See United States v. Sangaree*, Cause No. 1:97cr27-MMP (N.D. Fla.), Docs. 230 & 245.

Sangaree's testimony was critical at sentencing, however, with regard to the threat that Boswell made against him, which resulted the two-level enhancement for obstruction of justice and a life sentence.  Without the two-level enhancement, Boswell's sentencing range would have been 360 months to life imprisonment.  The question is thus whether counsel were ineffective in failing to take additional steps to discredit Sangaree's testimony, such as "seeking leave of this Court to enter the jail and take photographs to inform this Court's decision," since, once again, "[u]pon information and belief, the scenario as described [by Sangaree at trial] is not consistent with the physical jail arrangement."  Doc. 859.

This is hardly sufficient to prove that counsel were ineffective for not taking additional steps towards discrediting Sangaree's testimony.  They attempted to secure the polygraph

examination, but the Court was not persuaded, and counsel cannot be faulted for failing to prevail

on a motion.  Furthermore, they made the argument which Defendant now presses, but he has

offered nothing except vague "information and belief" to support his contention that a visual

explication of the jail layout would have persuaded the Court that Sangaree was not credible.  In

this Court's mind, Defendant cannot show that counsel's decisions on this issue were

unreasonable and thus deficient, and this ground for relief should be denied.

  E.  Failure to consult with Boswell or his family.

  In this claim of ineffectiveness, Boswell states that his counsel "spent virtually no time

with him.  They accepted few if any telephone calls when he was incarcerated in Florida and they

were in Kentucky."  Doc. 859.  According to Boswell, when the attorneys arrived in Gainesville,

they "spent a few moments with [him] the next day.  The discussions were last minute and were

not designed to gather Mr. Boswell's input but rather to fulfill a late-recognized obligation."  *Id*.

In Defendant's view , counsel engaged in absolutely no investigation, and therefore, he was taxed

with drug quantity "guesstimates" which increased his sentencing exposure.  *Id*.

  Counsel attempted to secure the precise quantities of the drugs at issue via a bill of

particulars, which was denied by the Court.  Again, counsel cannot be faulted for failing to secure

requested relief.  Furthermore, Defendant's assertion that counsel failed to investigate this case or

consult with him is belied by the record in this case.  Counsel filed numerous pretrial motions,

including a motion for sanctions against the Government for using jailhouse informants, such as

Sangaree, in violation of Defendant's Fifth and Sixth Amendment rights, and attended three in-

court proceedings between April 19, 1999, and May 27, 1999, including a detention hearing,

arraignment on the superseding indictment, and a motion hearing.  Defendant does not make any

allegation that counsel avoided him on those occasions, only that they did not consult with him until the Saturday before trial and then only for a "few moments."  In and of itself, counsel's failure to devote the whole weekend before trial to face-to-face consultations with their  client is not out of the ordinary and certainly not unreasonable or necessarily outside the bounds of professional responsibility.  The motions filed in this case clearly show a level of investigation, both legally and factually, which went beyond the minimum, and although counsel filed their motions well in advance of trial, they had no control over the timing of hearing on those motions or the issuance of decisions thereon.

     F.     Failure to move timely for polygraph examination to refute testimony of Sangaree.

     The Court has previously addressed the issue of Larry Sangaree from a slightly different perspective.  It will, on this occasion, merely add the following.  The timing of counsel's polygraph motion was not an issue when it was argued–indeed, the Government agreed to a continuance if necessary--and thus, there is no reason to believe that the Court denied the motion based on when it was filed.  The same is true with regard to the request for a continuance to investigate witnesses to impeach Walter Penick.  Furthermore, it is clear to this Court that counsel knew well before "the virtual eve[ ] of sentencing" that Sangaree's testimony would be important at sentencing.  They filed two different motions to exclude his testimony before trial and then several weeks before sentencing, submitted objections to the PSR, attacking, in pertinent part, Sangaree's credibility and any point assessment based on his testimony.  *See* Doc. 302 (letter from probation officers setting August 24, 1999, as deadline for submitting written objections to PSR).  In short, this allegation of ineffectiveness is not supported by the record and should likewise be denied.

**CONCLUSION**

Having carefully considered the matter, the Court finds that Defendant has not proved either that Mr. Wilson had a conflict in this case or that his attorneys were ineffective in their representation of him.  As to Defendant's requests for a polygraph examination and other miscellaneous relief which are appended to the motion to vacate, those were never properly brought to the Court's attention via separate motion, as they should have been, but in any event, they should be denied as well.

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion to vacate, set aside, or correct sentence, Doc. 859, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this **21st** day of July, 2006.


s/ A. KORNBLUM
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.